PEOPLE *v.* DETROIT, BELLE ISLE & WINDSOR FERRY CO.

1. MUNICIPAL CORPORATIONS—CITIES—SMOKE—EVIDENCE—BOATS.

   Testimony of practical experts that no device existed that would prevent the emission of smoke from the boilers of ferry boats, disputed by certain evidence produced by the people, in a prosecution under the Detroit smoke ordinance, *held*, to require the court to find on certiorari that the ordinance was invalid and unreasonable as to a corporation engaged in the operation of ferry boats.

2. SAME—NUISANCES—SMOKE ORDINANCE.

   The invalidity of the ordinance, however, might not be such as to prevent future prosecutions, if a device should be invented or discovered which would operate efficiently in preventing the emission of dense or heavy smoke from marine engines.

3. SAME—CRIMINAL LAW—NUISANCE.

   But the invalidity of the smoke ordinance would not preclude a prosecution against respondent or its officials for

   187 Mich.—12.

a common law nuisance if their acts warrant such a prosecution.

4. SAME—JUDGMENTS—RES JUDICATA.

A former judgment of the recorder's court of the city of Detroit finding that no sufficient smoke consumer or other means of prevention existed, is not *res judicata* as to the respondent's responsibility in this prosecution.

Certiorari to the recorder's court of the city of Detroit; Connolly, J. Submitted November 10, 1914. (Docket No. 167.) Decided July 23, 1915.

The Detroit, Belle Isle & Windsor Ferry Company was convicted of violating an ordinance of the city of Detroit. Reversed.

*Thomas P. Penniman* (*Richard I. Lawson*, of counsel), for the people.

*Gray & Gray* (*A. W. Sempliner*, of counsel), for respondent.

STEERE, J. This case involves the validity of an ordinance of the city of Detroit relative to the so-called smoke nuisance as applied to marine practice. Section 1 of the ordinance provides:

"That the emission of dense black or gray smoke from any smokestack or chimney used in connection with any steam boiler, locomotive or furnace of any description, in any apartment house, building, boat or any other structure, or in any building used as a factory, or for any purpose of trade, or for any other purpose whatever, within the corporate limits of the city of Detroit shall be a public nuisance *per se.*"

Section 6 of said ordinance is as follows:

"The owner or owners of any locomotive, engine, steamboat, tug, dredge, or pile driver, and the general manager, superintendent, yardmaster, engineer, fireman or other officer or employee having in charge or control the operation of any locomotive, engine, steamboat, tug, dredge, or pile driver, within the corporate limits of the city of Detroit, who shall cause,

permit or allow such dense black or gray smoke to be emitted therefrom within said corporate limits, shall be deemed guilty of creating a public nuisance and of violating the provisions of this ordinance."

Under this ordinance complaint was filed against defendant and appellant in the recorder's court on the 18th day of August, 1908. A motion to quash and dismiss the complaint was made by the defendant on several grounds:

(1) That in a former case in the same court the ordinance was held to be impossible of observance in marine practice and therefore invalid, and that decision was a bar to this prosecution.

(2) That the ordinance was unreasonable and invalid because there was no known appliance which could be used upon marine boilers to prevent the issuance of smoke.

(3) Because it would destroy the value of defendant's property, it being a practical impossibility to rearrange the equipment of the boats so as to prevent the issuance of smoke.

(4) Because the ordinance destroys the value of defendant's property without making adequate compensation therefor, and deprives the defendant of its property without due process of law.

(5) That the Federal courts had exclusive jurisdiction to regulate the navigation of these vessels.

(6) That the ordinance and complaint declare smoke a nuisance *per se*, and there is no charge that defendant created or maintained a common-law nuisance.

The motion to quash being denied, proofs were taken at intervals from November 27, 1908, until February 16, 1911. This testimony related to the reasonableness or unreasonableness of the ordinance as applied to marine practice; as to what devices to prevent the issuance of smoke had been able to accomplish on boats; and the experiments of this defendant and others with devices to prevent smoke emission and their impracticability in the operation of boats. On February 16, 1911, at the close of the case, the motion

to quash was again renewed for the same reasons, and for the further reasons:

(1) That the ordinance was invalid and unreasonable, because it made no allowance for smoke that must be emitted when fires were being started, cleaned, or pricked; (2) because it appeared from the testimony that there were no devices known in marine practice that would successfully prevent the emission of smoke.

This motion was denied, the defendant found guilty, and a fine was imposed.

The case is reviewed in this court by writ of error. It appears from the record that in October, 1906, a similar complaint had been lodged against the same defendant, and that on May 27, 1907, the same judge who heard the case at bar delivered an opinion, in part, as follows:

"I find, as charged in respondent's fourth objection, that this ordinance is impossible of observance in marine practice. The overwhelming preponderance of evidence in this case compels me to this conclusion. Indeed, after the fiasco in the *Lansdowne Case,* the people seem unable to suggest any device which has even a fair record for preventing smoke in marine practice. I do not believe it would be just or reasonable to compel marine interests to experiment with every quack nostrum for smoke prevention which is exploited by promoters. In land practice, approved and successful devices are known to the engineering profession; I am convinced that none such is known in marine practice. If there was, I am confident that Frank E. Kirby would know, and tell, about it."

Nevertheless the court on the second hearing reached a contrary conclusion. A portion of the opinion follows:

"The whole subject of the unreasonableness of this ordinance and of the possibility of complying with its mandate in the present state of the marine engineering art has been exhaustively investigated and studied for a long period of time. Witnesses of noted scientific attainment have been produced, and their testimony is in the record. In addition to the taking of testimony,

the court and counsel went to the city of Chicago in June, 1910, and personally investigated the operation of the marine plant in the dredge 'Francis J. Simmons,' operating off Lincoln Park in Chicago, and of the tug 'Keystone,' operating in conjunction with the dredge 'Simmons.' These marine plants were equipped with what is known as the Jones underfeed stoker. The 'Simmons' is engaged in sucking dirt from the bottom of Lake Michigan and pumping it through possibly a mile of pipe to the shore, where an addition is being built to Lincoln Park. The work is irregular; frequent stops being necessary.

"The personal inspection of the court was conclusive, beyond all cavil or question, that the marine plant of the 'Francis J. Simmons' did not emit any objectionable smoke when the underfeed stoker system was in operation; but that, when the underfeed stoker system was shut off, dense black or gray smoke was forthwith emitted from the stack, and almost immediately ceased when the underfeed stoker system was put back in operation.

"The personal observation of the court as to the tug 'Keystone' was to the effect that, although the Jones underfeed stoker was installed in cramped quarters, it rendered satisfactory service in preventing the emission of smoke.

"In June, 1911, counsel for the city invited the court and counsel for the defendant to inspect a similar equipment on an excursion steamer known as the 'City of Benton Harbor,' plying between Chicago, Ill., and Benton Harbor, Mich. Through some misunderstanding, counsel for the defendant did not participate in this inspection, but counsel for the city and the court journeyed from Chicago to Benton Harbor on the 'City of Benton Harbor,' and personally observed the effect of the operation of the Jones underfeed stoker in that marine plant. For several miles of the journey another ship, called the 'City of South Haven,' which was not equipped with the Jones underfeed stoker, journeyed on a parallel course to that of the 'City of Benton Harbor,' and the contrast in the smoke emitted was most marked. The 'City of South Haven' left an enormous trail of black smoke in its wake across the lake; the 'Benton Harbor,' maintaining as good a rate

of speed as the 'South Haven,' left practically no trail of smoke in its wake.

"A review of the whole record in this case, including the testimony taken in court, the depositions taken in Chicago with reference to the dredge 'Simmons,' and the personal observations of the court as to the operation of marine plants equipped with Jones underfeed stokers convinces the court that the present state of marine engineering art is not such as to render impossible the prevention of objectionable smoke in marine practice.

"A similar complaint to the one now under consideration was made against this defendant some years ago, when I first came upon the bench of this court. At that time, there was no smoke-preventing equipment in marine practice that had a demonstrated efficiency, and I dismissed the complaint, believing that the ordinance was unreasonable and void at that time, in that it required an impossibility of the defendant. But I am satisfied that the development of the art since that time has been such as to make it possible so to equip a marine boiler as to prevent the emission of objectionable smoke.

"The objection that there is not sufficient room on these ferryboats to equip them with smoke-preventing devices, in my judgment, falls to the ground upon an inspection of the equipment in the cramped quarters of the tug 'Keystone.'

"The claim that the Houden hot-air draft prevents smoke is confuted by the fact that these ferryboats, although so equipped, have flagrantly offended against the smoke ordinance in this case.

"These objections could have no weight at all in the case of *People* v. *White Star Line Company,* because their steamer 'The Tashmoo' is overboilered, and has plenty of room in which to make the proper equipment.

"The court has been at great pains, with the aid of counsel, to consider exhaustively this whole subject so that no hardship might be inflicted upon the defendants by requiring them to expend large sums of money in uncertain or experimental devices. The net result of this investigation, as I said before, is to the effect and purport that smoke prevention in marine practice has passed the experimental stage, and is now

such a reasonable certainty, both as to smoke prevention and increase of plant efficiency, that this ordinance cannot fairly be considered to be unreasonable in its mandate.

"I do not consider it necessary to discuss the other objections raised by counsel as to the enforcement of this ordinance in this case, being content to rule, generally, that they are not, in my judgment, well founded. The principal objection is to the reasonableness of the ordinance, and I am constrained to hold that it is reasonable and practicable and therefore valid, and that it is the defendant's duty to comply with it."

Recognizing the importance of this case not alone to the owners of vessels plying upon the Detroit river within the corporate limits of the city of Detroit, but to the city of Detroit itself, we have given careful attention to the testimony introduced relative to the practicability and efficiency of the appliances used for the prevention of smoke in marine equipment in the present state of the art. We think it fair to assume that the conclusion reached by the learned judge who tried the case below was based upon his belief that the Jones underfeed stoker had reached such a state of perfection as to make its installation in marine practice feasible and reasonable, and the results to be obtained therefrom satisfactory. That testimony related to five boats, only, where such installation had been made. It would be of no avail to set out the voluminous testimony upon this question. It is sufficient to say that to our minds it is far from convincing. In some instances it is clear that the appliance, after its installation, has been removed, and in all instances the results obtained are not left entirely free from doubt.

The expert testimony introduced upon the question, while not conclusive, strongly persuades us to the view that up to the present time no device has been invented which within the confined space available for installation in marine practice is adequate for the

elimination of smoke so long as the consumption of bituminous coal is permitted.   Mr. Frank E. Kirby, whose opinion seemed to have controlled—or at least largely influenced—the judgment of the court below upon the former trial, testified in the case at bar as follows:

"There is no efficient device that is known to me for the prevention of smoke in marine practice."

Mr. Kirby is known as perhaps the most experienced designer of vessels for use on inland waters in the State of Michigan.

Prof. Frederick C. Sadler of the University of Michigan, an expert of distinction, testified as follows:.

"I do not know of any device with which a marine plant can be equipped at the present time that would operate successfully under marine conditions and eliminate the emission of smoke in the operation of the vessels on the Detroit river here and the ferry service.   *   *   *

"*Q.* Will you state whether in your judgment, from the investigation and studies you have made, it is possible to construct a steamer for passenger service on the Detroit river and equip it with any device— the Jones underfeed or any other—that when so equipped will be efficient for operation and service and comply with all the government requirements for operation?

"*A.* I do not know of any such device."

Testimony to the same effect was given by the following persons:   Peter McLaren, chief engineer for 20 years of the Walkerville ferry line; Frank W. Stogell, superintendent of Hiram Walker & Sons, Ltd., an engineer for 15 years; Edward A. Dustin, manager of the Ashley & Dustin Steamer Line; Arthur J. Fox, of the same line, a master and pilot since 1874; J. P. Wells, of the Detroit & Cleveland Navigation Company, a marine engineer for 25 years; Winfield Dubois, a marine engineer for 35 years, with the White Star Line; James D. Stewart, a marine engineer

for 20 years, and for 3 years operating a Jones underfeed stoker; Minton Sicklesteel, a marine engineer for 10 years with the Detroit & Cleveland Navigation Company; George F. Moore, an employee of the city of Detroit, and marine engineer for 15 years and engineer of the fire tug James F. Battle; and A. G. Mattsson, chief engineer of the Great Lakes Engineering Works.

It is perhaps worthy of note that the fire tugs James F. Battle and James R. Elliott, belonging to the city of Detroit, and operating upon the Detroit river, are not equipped with either the Jones underfeed or any other smoke consuming device.

Taken in its entirety, we are convinced that the testimony as to the impracticability of the Jones underfeed in marine practice fairly sustained the position of defendant.

We do not think it can be said that the earlier opinion of the recorder's court is *res judicata* of the question; nor should the conclusion reached in the case at bar be regarded as a bar to a future action under the ordinance, if, in the advance of the art, appliances are invented which in marine practice are efficient and practical. Nor is it to be deduced from this opinion that the defendant or other offenders may not be held liable as for the creation of a common-law nuisance if their acts warrant prosecution therefor.

Having reached this conclusion upon a point controlling of the issue, it is unnecessary to consider the other questions raised by the appellant.

The judgment is reversed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.